**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| BARBARA J. LONG, | ) CASE NO. 1:14-CV-615 |
| | ) |
| Plaintiff, | ) JUDGE GAUGHAN |
| | ) |
| v. | ) MAGISTRATE JUDGE |
| | ) VECCHIARELLI |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner | ) |
| of Social Security, | ) |
| | ) **REPORT AND RECOMMENDATION** |
| Defendant. | ) |

Plaintiff, Barbara J. Long ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

her application for Period of Disability ("POD") and Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423.  This case is

before the undersigned United States Magistrate Judge pursuant to an automatic

referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons

set forth below, the Magistrate Judge recommends that the Commissioner's final

decision be AFFIRMED.

## I.   PROCEDURAL HISTORY

On August 29, 2011, Plaintiff filed an application for POD and DIB, alleging a

disability onset date of March 23, 2011.  (Tr. 10.)  The application was denied initially

and upon reconsideration and Plaintiff requested a hearing before an administrative law

judge ("ALJ").  (*Id*.)  On October 11, 2012, an ALJ conducted a hearing, at which

Plaintiff was represented by counsel.  (*Id*.)  Plaintiff appeared and testified, as did an

impartial vocational expert ("VE").  (*Id.*)  On October 26, 2012, the ALJ issued a

decision finding that Plaintiff was not disabled.  (Tr. 10-21.)  On January 24, 2014, the

Appeals Council declined to review that decision, and the ALJ's decision became the

final decision of the Commissioner.  (Tr. 1.)

On March 20, 2014, Plaintiff filed her Complaint challenging the Commissioner's

decision in this Court.  (Doc. No. 1.)  The parties have completed briefing in this matter.

(Doc. Nos. 15-17.)  Plaintiff argues that substantial evidence does not support the ALJ's

decision because: (1) the ALJ improperly evaluated medical opinion evidence; (2) the

ALJ improperly evaluated Plaintiff's credibility; and (3) the ALJ relied on VE testimony

given in response to an inaccurate hypothetical.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in November 1961 and was 49 years old on the alleged onset

date.  (Tr. 203.)  She has at least a high school education and can communicate in

English.  (Tr. 19.)  Plaintiff had past relevant work as a massage therapist, sales

person, assistant manager, kitchen manager and cook.  (Tr. 10, 245.)

### B.    Medical Evidence

#### 1.    Plaintiff's Providers

On March 17, 2009, cardiologist Faran Bashir, M.D., examined Plaintiff after she

complained of chest pain and pressure, and losing consciousness after turning her

head while giving a massage.  (Tr. 310-11.)  Dr. Bashir noted that an MRI of Plaintiff's

neck revealed five herniated neck discs at C4-6 and lumbar thoracic areas secondary to

2

a previous fall. (Tr. 310.) Dr. Bashir diagnosed Plaintiff with chest pain and pressure; syncope with abnormality in the neck structure; obesity; hypertriglyceridemia; cardiac murmur; and history of asthma. (Tr. 311.) He recommended that Plaintiff continue to lose weight, obtain an echocardiogram and a nuclear stress test, and follow up after testing. (*Id.*) An April 2009 nuclear stress test and echocardiogram revealed normal results. (Tr. 312, 315.)

On September 24, 2010, psychiatrist Navid Ayub, M.D., examined Plaintiff, who reported eating and sleeping well, an improved relationship with her boyfriend, and no stressors. (Tr. 345.) Dr. Ayub described Plaintiff as having: normal alertness and speech; good eye contact; an appropriate affect; euthymic and relaxed mood; cooperative attitude; logical associations; fair concentration, intellect, insight and judgment; and intact memory. (*Id.*) He characterized the severity of her symptoms as borderline, and noted that her global improvement was "much improved." (Tr. 346.)[1] Dr. Ayub opined that Plaintiff was stable and tolerating her medications well. (*Id.*) He diagnosed her with bipolar disorder. (*Id.*) He assigned her a Global Assessment of Functioning ("GAF") score of 60. (*Id.*)

On November 19, 2010, Dr. Ayub described Plaintiff as having: normal alertness and speech; good eye contact; an appropriate affect; euthymic and relaxed mood; cooperative attitude; logical associations; fair concentration, intellect, insight and judgment; and intact memory. (Tr. 343.) He noted Plaintiff's report that she was

---

[1] The content of the September 2010 treatment note from Dr. Ayub reflects that he had previously examined Plaintiff. The administrative transcript, however, does not include any earlier treatment notes from Dr. Ayub.

considering obtaining a second job because she was having financial stress.  (*Id*.)  He described her symptoms as borderline and noted that she was "much improved."  (Tr. 344.)  He assigned Plaintiff a GAF score of 60.  (*Id*.)

In a December 14, 2010 assessment, Dr. Ayub noted that Plaintiff's "target symptoms'" were depressed mood, isolation, suicidal ideation and low energy level. (Tr. 347.)  He had prescribed Abilify, benztrophine mesylat, and bupropian.  (*Id*.) According to the assessment, Plaintiff reported no adverse side effects and felt that she was "able to lead a stable and functional life" on the medications.  (*Id*.) Plaintiff was looking for a job in the spa management field, and was working as a massage therapist. (*Id*.)  She reported spending a lot of time with her boyfriend and college friends (*Id*.)

On January 14, 2011, Dr. Ayub noted Plaintiff's complaint that she was hearing voices, felt fearful and had poor sleep and low energy.  (Tr. 341.)  Dr. Ayub discontinued Plaintiff's Abilify and started her on Risperdal and Ambien.  (*Id*.)  He diagnosed her with an increase in depressive symptoms with psychosis.  (Tr. 342.)  He assigned Plaintiff a GAF score of 60.  (*Id*.)  On February 15, 2011, Plaintiff reported to Dr. Ayub that the new medications were effective in controlling her paranoia, delusions and insomnia.  (Tr. 339.)  He characterized her mood as stable.  (Tr. 339.)  He assigned Plaintiff a GAF score of 60.  (*Id*.)

On March 24, 2011, Plaintiff complained to her family physician of pain and swelling in her right wrist while performing a massage.  (Tr. 327.)  The physician diagnosed Plaintiff with right wrist sprain.  (*Id*.)  The report of an April 2011 image of Plaintiff's right wrist noted a history of injury to that wrist, but revealed a normal result.

4

(Tr. 321.)

On April 12, 2011, Dr. Ayub noted Plaintiff's complaint of feeling anxious, fidgety and unable to control her anxiety.  (Tr. 337.)  She felt like she was going to "lose her mind."  (*Id*.)  Plaintiff reported that she had been off of work and was receiving workers compensation benefits due to her wrist injury.  (*Id*.)  Dr. Ayub started Plaintiff on a trial of Lorazepam.  (*Id*.)  He assigned Plaintiff a GAF score of 60.  (*Id*.)  On April 27, 2011, Plaintiff reported a "fine" mood and no anxiety or depression.  (Tr. 335.)  She was sleeping well and denied suicidal ideation or feelings of hopelessness.  (*Id*.)  Dr. Ayub described Plaintiff as having: normal alertness and speech; good eye contact; an appropriate affect; euthymic and relaxed mood; cooperative attitude; logical associations; fair concentration, intellect, insight and judgment; and intact memory. (*Id*.)  He instructed her to continue her medication regimen.  (Tr. 336.)  He assigned Plaintiff a GAF score of 60.  (*Id*.)

On May 27, 2011, Kraig Burgess, D.O., examined Plaintiff in response to her complaints of continued pain and swelling in her right wrist.  (Tr. 375-76.)  He noted that Plaintiff had undergone cortisone injections and physical therapy, and was using a splint.  (Tr. 375.)  He encouraged Plaintiff to consider surgery, given that more conservative treatments had not resulted in a decrease in her symptoms.  (Tr. 376.) Initially, Plaintiff agreed but then declined to undergo the surgery because Plaintiff "and her husband are going to Costa Rica, basically for a month and will be back in July." (*Id*.)

On July 6, 2011, Plaintiff agreed to undergo surgery on her right wrist.  (Tr. 373.)

5

On July 12, 2011, Plaintiff told Dr. Ayub that she was frustrated with the process required for her to obtain her prescription medications.  (Tr. 332.)  She reported feelings of emotional stress and unhappiness associated with possibly losing her job due to her wrist injury.  (*Id*.)  She was sleeping more than usual because it helped her forget about her life.  (*Id*.)  She denied feeling hopeless or having suicidal ideation.  (*Id*.)  Dr. Ayub described Plaintiff has having mild symptoms.  (Tr. 333.)  He encouraged her to engage in activities that increased her interaction with people, such as volunteering or attending church.  (*Id*.)  He assigned Plaintiff a GAF score of 60.  (Tr. 334.)

On August 12, 2011, Dr. Burgess noted that, one week after surgery on her right wrist, Plaintiff reported that her wrist pain had lessened and that she was "doing better."  (Tr. 372.)

During an appointment with Dr. Ayub on August 23, 2011, Plaintiff was initially pleasant and cooperative, but then became tearful when she began talking about a condition called Morgellons disease.[2]  (Tr. 330.)  She believed that she had contracted

---

[2] The Mayo Clinic describes Morgellons disease as follows:

> Morgellons disease is the popular name for an unexplained skin disorder characterized by disfiguring sores and crawling sensations on and under the skin. Morgellons disease also features fibers or solid materials emerging from these sores.

> Researchers with the Centers for Disease Control and Prevention (CDC) have concluded that Morgellons disease, which they refer to as an unexplained dermopathy, isn't caused by an infection or parasites. Fibers found in the sores are usually wisps of cotton thread, probably coming from clothing or bandages.

> CDC experts note that the signs and symptoms of

the condition from a client, and described itching all over her body and feeling insects crawl under her skin.  (*Id*.)  She believed that she had spread the condition to her dog. (*Id*.)  Dr. Ayub described Plaintiff's affect as tearful, her mood as anxious, and her thought content as fearful and obsessive.  (Tr. 330-31.)  Dr. Ayub continued Plaintiff's medication regimen and advised her to follow up with her primary care physician regarding her skin condition.  (Tr. 331.)  He assigned Plaintiff a GAF score of 60.  (*Id*.)

On September 16, 2011, Dr. Burgess opined that Plaintiff could slowly return to work as a massage therapist, and that she was "capable of doing a soft tissue massage only, one patient per day."  (Tr. 370.)  On September 30, 2011, Dr. Burgess released Plaintiff to full work activities.  (Tr. 369.)

On October 6, 2011, Plaintiff reported to Dr. Ayub that she was depressed and that she was experiencing auditory hallucinations.  (Tr. 410.)  Dr. Ayub increased her Risperdal dosage.  (*Id*.)  Dr. Ayub described Plaintiff's affect as tearful, and her mood as anxious and dysphoric. (Tr. 411.)  He opined that her symptoms were mild, and assigned her a GAF score of 60.  (Tr. 411-12.)

On December 9, 2011, Dr. Ayub noted Plaintiff's report of feeling easily distracted, with poor concentration and focus, and difficulty finishing household projects.  (Tr. 408.)  Dr. Ayub described Plaintiff's symptoms as mild, and added Ritalin

---

Morgellons disease are very similar to those of a mental illness involving false beliefs about infestation by parasites (delusional parasitosis).

Morgellons Disease: managing a mysterious skin condition, available at

http://www.mayoclinic.org/morgellons-disease/art-20044996 (last visited Nov. 12, 2014).

to her medication regimen.  (Tr. 409.)  He assigned Plaintiff a GAF score of 60.  (*Id*.)

During a January 12, 2012 appointment with Dr. Ayub, Plaintiff was initially happy and relaxed, reporting that the Ritalin had been effective and that her depression had lifted enough to allow her to complete household chores.  (Tr. 405.)  She became depressed and tearful, however, after asking Dr. Ayub to complete a form in support of her application to have her student loan discharged on the basis of permanent disability.  (*Id*.)  Dr. Ayub described Plaintiff as having a tearful affect and a dysphoric mood.  (*Id*.)  He described her symptoms as borderline, and assigned her a GAF score of 60.  (Tr. 406-07.)  In a January 25, 2012, letter, Dr. Ayub opined that "it has been difficult for [Plaintiff] to remain employed due to a hand injury, an increase in psychiatric symptoms and several medication changes, leaving her unstable and unable to obtain employment."  (Tr. 536.)

On February 10, 2012, Plaintiff continued to complain of depression related to her inability to work due to her wrist injury.  (Tr. 403.)  Dr. Ayub recommended that she receive counseling.  (*Id*.)  He continued her medication regimen and described the severity of her symptoms as mild.  (Tr. 403-04.)  He assigned Plaintiff a GAF score of 60.  (Tr. 404.) On March 23, 2013, Dr. Ayub noted Plaintiff's continued struggle with the loss of her ability to work.  (Tr. 483.)  She denied any mood symptoms or psychosis. (*Id*.)  He described Plaintiff has having normal alertness; good eye contact, concentration, intellect, insight and judgment; cooperative attitude; logical and unremarkable thought process; appropriate affect; and euthymic mood.  (Tr. 483-84.) He continued Plaintiff's medication regiment and assigned her a GAF score of 60.  (Tr. 484.)

8

Also on February 10, 2012, David Patchett, D.O., a physician at Midwestern University, examined Plaintiff, noting her complaints of neck pain, right hip pain and right low back pain.  (Tr. 528.)  His exam revealed primary fascial restriction in Plaintiff's right hip, iliolumbar ligament and right long dorsal ligament of the sacrum. (Tr. 529.)  Dr. Patchett diagnosed Plaintiff with somatic dysfunction of the cervical and thoracic regions, the head, rib cage, abdominal area, and upper extremities; cranial nerve disorder, and back sprain.  (Tr. 530.)  He performed an osteopathic manipulative treatment ("OMT").  (*Id.*)  Plaintiff underwent OMT twice more in February 2012, and again in March and April 2012.  (Tr. 524-27, 517-20, 513-16, 506-09, 502-05.)  Dr. Patchett opined that Plaintiff responded very well to the OMT.  (Tr. 515.)

On May 10, 2012, David Hume, D.O., another physician at Midwestern University with whom Plaintiff had treated for various ailments, noted that Plaintiff was requesting that he fill out disability paperwork.  (Tr. 499.)  In his notes, Dr. Hume stated as follows:

> I did inform the patient that I am unable to complete the paperwork given to her by her lawyer for disability due to the highly specific nature of the questions regarding . . .  mental health.  I told the patient because I do not have a long history of treating her mental health problems to include bipolar and psychosis I will not be able to thoroughly and properly fill out the paperwork accurately.  Did advise the patient to attempt to find a psychiatrist who may give her . . . reduced rate visits to have her paperwork fill out appropriately

.
(Tr. 501.)

On May 19, 2012, Dr. Ayub described Plaintiff as stable and tolerating her medications well.  (Tr. 481.)  He opined that her symptoms and depression and psychosis were in better control on her medications.  (*Id.*)  He assigned her a GAF

9

score of 60, and characterized the severity of her symptoms as mild and her global

improvement as "much improved."  (Tr. 482.)  On July 13, 2012, Dr. Ayub noted that

Plaintiff was responding well to her medication regimen.  (Tr. 479.)  Plaintiff described

her sleep as stable, her mood as less depressed, and her motivation level as improving.

(*Id*.)  Dr. Ayub described Plaintiff has having normal alertness; good eye contact,

concentration, intellect, insight and judgment; cooperative attitude; logical and

unremarkable thought process; appropriate affect; and euthymic mood. (Tr. 479-80.)

He opined that the severity of her symptoms was borderline, and assigned her a GAF of

60.  (Tr. 480.)

On September 12, 2012, Dr. Ayub described Plaintiff as tearful and stressed

about her finances.  (Tr. 476.)  Plaintiff described feeling hopeless and without any

recourse for her situation.  (*Id*.)  Dr. Ayub described Plaintiff's affect as appropriate and

tearful, and her mood as anxious, dysphoric and depressed.  (*Id*.)  He noted that her

concentration, intellect, insight and judgment were fair, and that her memory was intact.

(Tr. 477.)  He described her symptoms as mild.  (*Id*.)  Dr. Ayub noted that Plaintiff's

symptoms had stabilized for the prior six months, and described her then-current

increase in depression symptoms as situational.  (*Id*.)  He noted Plaintiff's comment that

she wished she was dead, but assessed her as having a low suicide risk.  (*Id*.)  Dr.

Ayub assigned Plaintiff a GAF score of 60.  (Tr. 478.)

On September 15, 2012, Dr. Ayub completed a medical source statement.  (Tr.

470-75.)  He noted that Plaintiff suffered from "chronic mental illness (diagnosed) -

bipolar disorder type II - depressed in partial remission - responding to current

medication trials and displays [illegible] in anxiety and depression with situational stressors." (Tr. 470.)  He described her prognosis as "stability," and indicated that Plaintiff experienced: thoughts of suicide; feelings of guilt or worthlessness; mood disturbance; difficulty thinking or concentrating; and bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes).  (Tr. 470-71.)

With respect to the mental abilities and aptitudes needed to do unskilled work, Dr. Ayub opined that Plaintiff was limited but satisfactory in the ability to: remember work-like procedures; understand and remember very short and simple instructions; and carry out very short and simple instructions.  (Tr. 472.)  He concluded that she was seriously limited, but not precluded, in the ability to: maintain attention for a two-hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; and be aware of normal hazards and take appropriate precautions.  (*Id.*)  Dr. Ayub stated that Plaintiff was unable to meet competitive standards in the ability to: work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.*)

With respect to semiskilled and skilled work, Dr. Ayub opined that Plaintiff was

11

limited but satisfactory in her ability to understand and remember detailed instructions, and seriously limited, but not precluded, in her ability to carry out detailed instructions. (Tr. 473.)  He determined that she was unable to meet competitive standards in her ability to: set realistic goals or make plans independently of others; and deal with the stress of semiskilled and skilled work.  (*Id*.)  Dr. Ayub explained that Plaintiff had "difficulty keeping a regular schedule and had repeated time off from last employment – inability to sustain attention for longer period[s] of time."  (*Id*.)

With respect to Plaintiff's ability to perform particular types of jobs, Dr. Ayub concluded that Plaintiff was limited but satisfactory in the ability to: interact appropriately with the general public; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; travel in an unfamiliar place; and use public transportation.  (Tr. 473.)  He explained that Plaintiff was "[l]imited under situational and environmental stressors.  Anxiety more pronounced when exposed to social setting." (*Id*.)  Dr. Ayub opined that Plaintiff would find the following work demands stressful: speed, complexity, deadlines, working within a schedule, being criticized by supervisors, getting to work regularly, and remaining at work for a full day.  (Tr. 474.) He stated that Plaintiff would miss for than four days per month as a result of her impairments.  (*Id*.)  Finally, he explained, "The deficits in functioning associated with bipolar disorder stem mostly from the [illegible] depression that patient suffers from. The depressive symptoms are more disabling.  Implicated heavily as a major cause of psychosocial disability."  (*Id*.)

On September 27, 2012, Dr. Patchett examined Plaintiff, noting her continued complaint of cervical neck pain and sacral pain.  (Tr. 487.)  His exam revealed a normal

12

range of motion with tenderness to palpitation at S1; intact sensation; and normal strength, gait and balance. (Tr. 488.) He diagnosed Plaintiff with somatic dysfunction of the sacroiliac and lumbar regions; sprained lumbosacral joint; and neck sprain. (Tr. 489.) He performed osteopathic manipulative treatment and instructed Plaintiff to return in one to two weeks. (*Id*.)

### 2. Agency Reports

On November 17, 2011, agency consulting psychologist Celia Drake, Ph.D., examined Plaintiff. (Tr. 379-82.) Plaintiff reported that she had been depressed since being sexually assaulted in 1992. (Tr. 379.) Plaintiff described feelings of depression, low energy and difficulty sleeping, with an elevated mood once a month. (Tr. 379-80.) Plaintiff described feeling anxious in small spaces, and an aversion to allowing people to get to close to her. (Tr. 380.) Plaintiff believed she had Morgellons disease, and stated that, two days prior, a worm had crawled out of her skin. (*Id*.)

Dr. Drake described Plaintiff's speech as fluent, and her thought process as organized but reflecting her "bizarre and probable psychotic thinking." (Tr. 381.) Plaintiff demonstrated depressed mood and a constricted affect, with average intelligence and compromised insight and judgment. (*Id*.) In the "opinion" section of her report, Dr. Drake stated as follows:

> [Plaintiff] presented with a history of mood disturbance and also bizarre and psychotic symptoms. While she takes medications symptoms are not completely controlled. Insight presented as compromised.

(*Id*.) Dr. Drake diagnosed Plaintiff with bipolar disorder, and assigned her a GAF score of 50. (*Id*.)

13

In a separate medical source statement, Dr. Drake stated that Plaintiff's condition imposed limitations that would last at least 12 months. (Tr. 383.)  With respect to understanding and memory, Dr. Drake opined that Plaintiff "presented with adequate comprehension of information but some problems with memory on assessment utilizing the [Mini Mental State Examination ("MMSE")]. (*Id.*)  With respect to sustained concentration and persistence, Dr. Drake stated that Plaintiff "should be able to follow workplace directives," but noted that "[s]he had problems with tasks of attention and concentration on the MMSE." (*Id.*)  With respect to social interaction, Dr. Drake concluded that, while Plaintiff "presented as pleasant, her perceptions are bizarre and likely reflect a psychotic process and that would like[ly] impact her functioning within a work setting." (*Id.*)  Finally, with respect self-control/care and adapting to change, Dr. Drake opined that Plaintiff "is having difficulty with functioning and by her report, in part, because of her physical symptoms.  She, however, has chronic psychiatric symptoms which are disruptive to her functioning." (*Id.*)

On November 29, 2011, agency consulting psychologist David Yandell, Ph.D., performed a case review.  (Tr. 78.)  He opined that Plaintiff "retains the ability to perform very short and simple job tasks on a sustained basis.  She will need to continue psychiatric trea[tment] and should seek jobs with little demand for interacting with others." (*Id.*)

On March 1, 2012, agency consulting psychologist Rosalia Pereyra, Psy.D., performed a mental residual functional capacity ("RFC") assessment.  (Tr. 102-04.)  With respect to Plaintiff's understanding and memory, and concentration and persistence, Dr. Pereyra opined that Plaintiff was moderately limited in her ability to:

14

understand and remember detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 102-03.)  Dr. Pereyra opined that Plaintiff was "distractable and will serve as a distraction to others with her bizarre talk describing psychotic [symptoms]."  (Tr. 103.)

With respect to social interaction, Dr. Pereyra assigned Plaintiff moderate limitations in the ability to: interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (Tr. 103.)  Dr. Pereyra explained that Plaintiff's moderate limitations in these areas arose out of her "describing her psychotic [symptoms]."  (*Id.*)  With respect adaptation, Dr. Pereyra opined that Plaintiff was moderately limited in her ability to: respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  (Tr. 104.)  In sum, Dr. Pereyra opined that Plaintiff was capable of performing "very short and simple jobs on a sustained basis," and should "seek jobs with little demand for interacting with others."  (*Id.*)

15

**C.     Hearing Testimony**

    **1.     Plaintiff's Hearing Testimony**

At her October 11, 2012 administrative hearing, Plaintiff testified as follows:

Plaintiff lived with her dog in a single-story house that was owned by her mother. (Tr. 33.)  Her boyfriend stayed there approximately half the time.  (*Id.*)  Plaintiff had an associate's degree in restaurant/hotel management, and certificate in massage therapy and aromatherapy.  (Tr. 34.)  She had not worked since March 2010 because her "mental state was too fragile."  (Tr. 39.)  Plaintiff believed that her mental health issues had been exacerbated by the loss of her ability to perform massages due to her wrist injury.  (Tr. 39-40.)  Her wrist continued to cause her pain, particularly after heavy use. (Tr. 41.)  Plaintiff also noticed that her strength in her right wrist had diminished.  (Tr. 41-42.)

Plaintiff was also unable to perform massages because her mental impairments affected her ability to "fight through or fight off" the negative energy that she received from her clients while performing massages.  (Tr. 42.)  This made her depression worse because she took in "bad energy" and was unable to get rid of it.  (Tr. 43.)

Plaintiff also believed that she suffered from Morgellon disease, although emergency room personnel had told her that it was "in [her] mind."  (Tr. 44.)  The medical community did not want to recognize that Morgellon disease was "out there" because "[i]t's too big.  It's too scary."  (*Id.*)  Plaintiff believed she contracted the condition when she performed a massage in her bare feet.  (Tr. 45.)  Plaintiff felt bugs

16

coming out of her skin and worried that the disease was harming her organs.[3]  (Tr. 44.)

When Plaintiff was depressed, she slept "for several days without really doing anything other than just getting up and going to the bathroom and going back to sleep." (Tr. 46.)  Other times, she stayed awake for four or five days in a row.  (*Id*.)  Her "low periods" lasted for several weeks.  (Tr. 46-47.)  Plaintiff experienced visual hallucinations, one of which was a very detailed vision of heaven and hell.  (Tr. 48-49.) At night, Plaintiff lit a white candle before bed to ward off demons and the dark.  (Tr. 49.)

Plaintiff and her boyfriend went camping, out to dinner, and to the movies.  (Tr. 55.)  They played cards.  (*Id*.)  Plaintiff occasionally looked for work when she was "up." (Tr. 56.)  She used a computer to check her e-mail account and to look at internet sites. (*Id*.)

### 2.      Vocational Expert's Hearing Testimony

The ALJ described a hypothetical individual of Plaintiff's age, education and work experience:

> [A]ble to perform at a medium exertional level, but would have the following postural limitations[:] They'd be only occasionally able to climb ladders, ropes and scaffolds. [The individual has] the following nonexertional limitations[:] Work would be limited to simple, routine and repetitive tasks with occasional interaction with the public and occasional[] interaction with coworkers.

(Tr. 62.)  The VE opined that the hypothetical individual would be able to perform work as a hand packager, dipper or scrap sorter.  (Tr. 63.)  In response to questioning by

---

[3] The record does not contain evidence that any physician ever diagnosed Plaintiff with Morgellon disease.

Plaintiff's counsel, the VE testified that an individual who missed four days of work per month would not be able to sustain work.  (Tr. 70.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot,* 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the

18

impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

In his October 26, 2012 decision, the ALJ made the following findings of fact and conclusions of law:

1.    Plaintiff meets the insured status requirements of the Act through June 30, 2016.

2.    Plaintiff has not engaged in substantial gainful activity since March 23, 2011, the alleged onset date.

3.    Plaintiff has the severe impairments of cervical neck pain; status post right hand surgery; hip pain; obesity; bipolar disorder; schizophrenia; depression; anxiety; panic attacks; and attention deficit hyperactivity disorder.

4.    Plaintiff does not have impairment or a combination of impairments that meets of medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, subpart P, appendix 1.

5.    Plaintiff has the RFC to perform medium work as defined in 20 C.F.R. 404.1567(c) with the following limitations: can occasionally climb ladders, ropes or scaffolds; work is limited to short and simple tasks; can occasionally interact with the public and coworkers.

6.    Plaintiff is unable to perform any relevant past work.

7.    Plaintiff was born in November 1961 and was 49 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset

19

date.

8.  Plaintiff has at least a high school education and is able to communicate in English.

* * *

10. Considering Plaintiff's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, specifically, hand packager, dipper, and scrap sorter.

11. Plaintiff has not been under a disability, as that term is defined in the Act, from March 23, 2011 through October 26, 2012, the date of the decision.

(Tr. 12-21.)

## V.  LAW & ANALYSIS

### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported

20

by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.      Plaintiff's Assignments of Error**

Plaintiff argues that substantial evidence does not support the ALJ's decision because: (1) the ALJ improperly evaluated medical opinion evidence; (2) the ALJ improperly evaluated Plaintiff's credibility; and (3) the ALJ relied on VE testimony given in response to an inaccurate hypothetical.

**1.      Medical Opinion Evidence**

Plaintiff argues that the ALJ erred in assessing the opinion of her treating pscyhiatrist, Dr. Ayub, and consulting psychologist, Dr. Drake.  In his decision, the ALJ made the following observations that are relevant to this issue, and which are supported by the record:

•      Plaintiff engaged in "a somewhat normal level of daily activity and interaction," including "camping, housework, going to the movies, going to dinner, having a boyfriend, and going to water aerobics," and "living alone, cooking, managing finances, cleaning, using a computer, shopping, e-mailing and traveling."

•      Plaintiff "worked while having her impairments . . . while she was being treated by Dr. Ayub," and "reported that she has actually been looking for work during her alleged period of disability, which indicates that she herself believes she is capable of some work."

•      The medical evidence in the record "indicates that [Plaintiff] received routine conservative treatments for the impairments," and "the positive objective clinical

and diagnostic findings do not support more restrictive functional limitations than those assessed" by the ALJ.

•   Plaintiff's treatment providers consistently assigned Plaintiff GAF scores of 60.[4]

•   The opinions of state agency consulting psychologists Drs. Yandell and Pereyra "were well supported by the totality of the medical evidence of record."

(Tr. 15-17.)

### a.   Dr. Ayub

There is no dispute that Dr. Ayub was Plaintiff's treating physician.  "An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the

---

[4] A GAF score between 51 and 60 indicates moderate symptoms, such as  flat and circumstantial speech and occasional panic attacks; or moderate difficulty in social occupational, or social functioning, exhibited by having few friends, or conflicts with co-workers.  A GAF score between 61 and 70 indicates mild symptoms, such as depressed mood and mild insomnia, or some difficulty in social, occupational or school functioniong.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

22

disposition of their cases" and to allow for "meaningful review" of the ALJ's decision,

*Wilson,* 378 F.3d at 544 (internal quotation marks omitted). Where an ALJ fails to

explain his reasons for assigning a treating physician's opinion less than controlling

weight, the error is not harmless and the appropriate remedy is remand. *Id.*

Here, Plaintiff argues that the ALJ erred in assigning less than controlling

weight to Dr. Ayub's September 2012 medical source statement, in which Dr. Ayub

opined that Plaintiff's bipolar disorder resulted in severe limitations in multiple areas

associated with her ability to work. In his decision, the ALJ "rejected" Dr Ayub's

statement:

> I reject the treating source statement of Dr. Ayub in
> September 2012. The opinion is based upon [Plaintiff's]
> subjective complaints and is inconsistent with the medical
> evidence of record. Moreover, the opinion is not supported
> by the doctor's own objective clinical findings. For example,
> in January 2012, [Plaintiff] presented as happy and relaxed
> and reported that her trial of Ritalin had been effective.
> Similarly, progress notes in October 2012[5] reported intact
> memory and good judgment and insight. Moreover, this
> opinion is inconsistent with [Plaintiff's] repeated [GAF]
> scores of 60. Furthermore, this opinion is contradicted by
> the opinion of other examining and State agency doctors,
> whose opinions I give greater weight. These other opinions
> are well-supported by medically acceptable clinical findings
> and are consistent with the record when viewed in their
> entireties. Finally, [Plaintiff] admittedly worked with her
> impairments at this level of severity and this is inconsistent
> with the notation that the limitations . . . Dr. Ayub noted to
> have existed for two years during that employment.

(Tr. 18.)

_____

[5] The treatment note to which the ALJ cites is actually from March 2012. (Tr.
483.) All notes from Dr. Ayub bear the "print date" of October 3, 2012, in a position
near the top of the page that makes it easily confused for the date on which the note
was entered. The ALJ's characterization of the note, however, is accurate.

Plaintiff raises several objections to the ALJ's analysis of Dr. Ayub's opinion. She contends that the ALJ "selectively cited several instances" of improvement reflected in Dr. Ayub's notes, without accounting for those notes that documented Plaintiff's depression and psychotic symptoms; that he failed to properly analyze the weight assigned to the opinion; and failed to provide "good reasons" for his decision to assign the opinion less than controlling weight.

The record does not support these arguments.  Although Dr. Ayub's notes reflect that Plaintiff experienced periods of psychotic symptoms and depression, considered as a whole, Dr. Ayub's notes reveal that Plaintiff was generally stable while on her medication.  Further, Dr. Ayub's examination notes reveal that he generally characterized the severity of Plaintiff's symptoms as "borderline" or "mild," and frequently noted that Plaintiff was improving.  Dr. Ayub's notes indicate that Plaintiff was a highly functional individual, despite her impairments.  Dr. Ayub's notes reflect that, even in those instances in which Plaintiff's psychotic symptoms increased, Dr. Ayub was able to control and alleviate the symptoms with a change in Plaintiff's medication regimen.  In sum, Dr. Ayub's September 2012 opinion was inconsistent with his objective clinical findings and the course of Plaintiff's condition throughout the record. The ALJ did not err in relying on this inconsistency to decline to given Dr. Ayub's opinion controlling weight.  *See Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 439 (6th Cir. 2012) (unpublished opinion) ("Any record opinion, even that of a treating source, may be rejected by the ALJ when the source's opinion is not well supported by medical diagnostics or if it is inconsistent with the record."); *Spicer v. Apfel*, 15 F. App'x 227, 233 (6th Cir. 2001) (unpublished opinion) ("One reason to disregard an opinion of

24

the treating physician is if it is inconsistent with the weight of the evidence in the record about a claimant's . . . condition.").  This inconsistency constitutes a "good reason" for doing so.  *See, e.g., Bass v. McMahon*, 499 F.3d 506, 512 (6th Cir. 2007) (finding that the ALJ's conclusion that the treating source's opinion was inconsistent with the physician's other statements and was contradicted by other evidence in the record was a "good reason" for assigning less than controlling weight).

Further, the ALJ sufficiently analyzed the issue of what weight to assign Dr. Ayub's opinion.  It is well settled that, where an ALJ "does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)).  However, there is no requirement that an ALJ engage in an explicit discussion of each factor.  *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 805 (6th Cir. 2011) ("Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion" – not an exhaustive factor-by-factor analysis.")  (quoting 20 C.F.R. § 404.1527(d)(2)) (alterations in original).  Here, the ALJ identified multiple inconsistencies between Dr. Ayub's September 2012 opinion and other elements in the record, including Dr. Ayub's own notes, the opinions of other medical sources, Plaintiff's GAF scores, and her activities during the relevant period of time.  These reasons

25

"permit[] . . . a clear understanding of the reasons for the weight given" to Dr. Ayub's opinion, *see Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010), and, thus, the ALJ's decision satisfies the purposes of the controlling physician rule.

Plaintiff also argues that the ALJ erred in giving greater weight to the opinions of non-examining agency consultants than to the opinion of Dr. Ayub.  This argument lacks merit.  Although the opinion of a treating source is generally entitled to greater deference than the opinion of non-examining source, *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007), an ALJ does not *per se* err in granting greater weight to the opinion of a non-examining source where the non-examining source's opinion "w[as] more consistent" with the record, *Norris*, 461 F. App'x at 440.  "Generally, the more consistent an opinion is with the record as a whole, the more weight [the agency] will give to that opinion."  20 C.F.R. § 404.1527(c)(4).  Here, the ALJ concluded that the opinions of the state agency consultants – Drs. Yandell and Pereyra – were more consistent with the record than the opinion of Dr. Ayub, and, thus, were entitled to greater weight.  (Tr. 17-18.)  These non-examining physicians each opined that Plaintiff had moderate limitations in multiple areas of functioning, and was capable of short, simple work that did not require her to interact with others.  (Tr. 78, 104.)  These limitations are consistent with the stable, borderline and improving symptoms described in Dr. Ayub's treatment notes, as well as with evidence in the record regarding Plaintiff's activities, all of which the ALJ discussed in his opinion.  Accordingly, the ALJ did not err in assigning greater weight to the opinions of the non-examining agency consultants

than to the opinion of Dr. Ayub.[6]

Accordingly, the ALJ's assessment of Dr. Ayub's opinion provides no basis for remand in this case.

### b.    Dr. Drake

Plaintiff argues that the ALJ also erred in his analysis of the opinion of Dr. Drake, a non-examining agency consultant.  Where a treating source is not given controlling weight, the ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist or other medical specialist."  20 C.F.R. § 404.1527(e)(2)(ii).

In his decision, the ALJ assigned no weight to Dr. Drake's opinion:

> No weight is given [to] the opinion of psychological
> consultative examiner Dr. Drake in November 2011.  The
> opinion fails to address [Plaintiff's] ability to work, is
> inconsistent with and not supported by treatment notes, and,

---

[6] In her Reply Brief, Plaintiff argues, for the first time, that the ALJ erred in assigning greater weight to these physicians' opinions than to Dr. Ayub's opinion because Drs. Yandell and Pereyra offered their opinions in November 2011 and March 2012, prior to Dr. Ayub's September 2012 opinion.  As a preliminary matter, because Plaintiff first raised this argument in a reply brief, it is properly deemed waived.  *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).  This argument also lacks merit.  The Sixth Circuit has determined that, where an ALJ gives greater weight to the opinions of state agency consulting physicians who have not reviewed the entire record, "we require some indication that the ALJ at least considered [the fact that the consulting physicians did not review the entire record] before giving greater weight" to their opinions.  *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009) (internal quotation marks omitted).  In this case, in discussing the opinions of Drs. Yandell and Pereyra, the ALJ stated their opinions were "well supported by the *totality of the medical evidence of record, as discussed above*."  (Tr. 17 (emphasis added).)  In his decision, the ALJ discussed Plaintiff's entire medical record, including the notes and opinions rendered after November 2011 and March 2012.  Accordingly, the ALJ considered the opinions of Drs. Yandell and Pereyra in light of the entire record, and the fact that the ALJ assigned greater weight to these opinion presents no basis for remand.

> as noted previously, is inconsistent with a [GAF] of 60 and
> the mental status exams [in Dr. Ayub's treatment notes].

(Tr. 18.)  Plaintiff argues that the ALJ failed adequately to explain his decision to assign

no weight to Dr. Drake's opinion.  Specifically, Plaintiff contends that Dr. Drake

assigned Plaintiff functional limitations, and that the ALJ failed to discuss those

limitations.

        The record reflects that, in addition to the report of her examination, Dr. Drake

completed a medical source statement provided by the state's Disability Determination

Service, which requested her opinion regarding Plaintiff's abilities in areas related to

work, such as understanding and memory; sustained concentration and persistence;

and social interaction.  (Tr. 383.)  The ALJ did not address these limitations in his

discussion of Dr. Drake's opinion.  Rather, he stated that Dr. Drake's opinion did not

address Plaintiff's ability to work.  This is arguably a misstatement of the record.  To the

extent this constitutes error, however, it does not merit remand in this case.  The ALJ

provided other reasons for assigning no weight to Dr. Drake's opinion:  that Drake had

assigned Plaintiff a significantly lower GAF score – 50 – than Dr. Ayub; and that Dr.

Drake's opinion was inconsistent with Dr. Ayub's treatment notes.  The record supports

these reasons.  Dr. Ayub consistently assigned Plaintiff a GAF score of 60.  Further, Dr.

Drake' s opinion that Plaintiff's symptoms were not well controlled despite her

medication regimen contradicts Dr. Ayub's treatment notes, which consistently reflect

that Plaintiff responded well to her medication regimen, and that Dr. Ayub was able to

control Plaintiff's symptoms by occasionally changing her medications.  Accordingly,

these other reasons constitute substantial evidence in support of the ALJ's decision to

assign no weight to Dr. Drake's opinion and this ground for relief presents no basis for remand in this case.  See *Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) ("When 'remand would be an idle and useless formality,' courts are not required to 'convert judicial review of agency action into a ping-pong game.'") (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, n.6 (1969)).

### 2.    Plaintiff's Credibility

Plaintiff argues that the ALJ improperly assessed her credibility.  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly.  See *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  However, the ALJ's credibility determinations must be reasonable and based on evidence from the record.  See *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 313, 312 (6th Cir. 1983).  The ALJ also must provide an adequate explanation for his credibility determination.  "It is not sufficient to make a conclusory statement 'that an individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.).  Rather, the determination "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight."  *Id*.

Here, the ALJ discussed Plaintiff's credibility at length, and determined that,

"while [Plaintiff was] generally credible," her credibility was "reduced" by the inconsistency between her allegations regarding the severity of her symptoms and the evidence regarding her level of activity and the routine and conservative treatment she received for her physical and mental impairments.  (Tr. 15.)  For example, the ALJ pointed to evidence that Plaintiff "engaged in a somewhat normal level of daily activity and interaction," including camping, going to the movies and dinner, maintaining a long-term relationship with her boyfriend, going to water aerobics and performing housework. (*Id*.)  According to the ALJ, Plaintiff's "ability to participate in such activities undermined the credibility of [Plaintiff's] allegations of disabling functional limitations."  (*Id*.)  Further, the ALJ observed that, "[e]ven if [Plaintiff's] daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to [Plaintiff's] medical condition, as opposed to other reasons, in view of the relatively benign medical evidence and other factors discussed in this decision." (*Id*.)  The ALJ noted that no medical source had endorsed the extent of Plaintiff's allegations, and that the objective medical findings in the record "do not support more restrictive functional limitations than those assessed" in the ALJ's decision.  (*Id*.)  These reasons are evident in the record and, thus, substantial evidence supports the ALJ's credibility determination in this case.

Plaintiff asserts a single specific argument on this issue.  At one point in the portion of his decision discussing Plaintiff's credibility, the ALJ stated that, "[I]n May of 2012, treating physician Dr. Hume refused to fill out [Plaintiff's] disability form."  (Tr. 16.) Plaintiff argues that the ALJ erred in relying on this fact to find her not credible, as the record shows that Dr. Hume declined to fill out the form because he did not feel that he sufficiently familiar with her mental impairments.  This is correct.  Review of Dr. Hume's

30

note from May 2012 reveals that his decision not to complete Plaintiff's paperwork was based solely on his lack of familiarity with her mental health issues, and not on any issue that would negatively reflect on Plaintiff's credibility.  Accordingly, to the extent the ALJ relied on Dr. Hume's refusal in finding Plaintiff not credible, that reliance is not supported by the record.  This error, however, is not sufficient basis for remand on this issue.  Review of the ALJ's decision reveals a lengthy, detailed discussion of Plaintiff's credibility, and an adverse credibility determination that is based on multiple factors other than Dr. Hume's refusal to complete the paperwork.  Accordingly, even absent any error regarding Dr. Hume's reasoning, there is substantial evidence to support the ALJ's adverse credibility determination in this case.

### 3. Hypothetical to the VE

Finally, Plaintiff argues that the ALJ erred in relying on VE opinion testimony that was given in response to an incomplete hypothetical question.  Specifically, Plaintiff argues that, because the ALJ erred in assessing the medical opinion evidence and her credibility, the RFC he proposed to the VE was inaccurate.  As discussed herein, however, substantial evidence support the ALJ's assessment of the medical opinion evidence and Plaintiffs credibility.  Accordingly, substantial evidence supports the ALJ's hypothetical to the VE (and the ALJ's determination of Plaintiff's RFC, which is identical to the hypothetical proposed to the VE), and this argument presents no basis for remand in this case.

31

## VI.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

_____

s/ *Nancy A. Vecchiarelli*_____
U.S. Magistrate Judge

Date: November 21, 2014

_____

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**